## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **SEALED DOCUMENT** |
| **Plaintiff,** | |
| **v.** | No.  1:20-cv-154 |
| **HVIZDZAK CAPITAL MANAGEMENT, LLC; HIGH STREET CAPITAL LLC; HIGH STREET CAPITAL PARTNERS, LLC; SHANE HVIZDZAK; and SEAN HVIZDZAK,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its

Complaint against Defendants Hvizdzak Capital Management, LLC ("HCM"); High Street

Capital LLC ("HSC"); High Street Capital Partners LLC ("HSCP"), Shane Hvizdzak ("Shane"),

and Sean Hvizdzak ("Sean"), alleges as follows:

## INTRODUCTION

1.      Since at least November 2019, Defendants have fraudulently raised and

subsequently misappropriated millions of dollars from the sale of limited partnership interests in

High Street Capital Fund USA, LP ("the Fund"), a Fund they claimed would invest in digital

asset for the benefit of Fund investors.  In soliciting investments, Defendants misrepresented key

information to potential investors about the Fund's past performance and assets, and provided

investors and/or their representatives with false financial statements and a forged audit report for

the Fund.  Once invested, Defendants, without investor knowledge or consent, moved millions of dollars of investor funds from Fund accounts into the personal bank accounts of Shane and Sean, where Defendants further dissipated investor funds into personal digital asset accounts.

2.      By engaging in the conduct described in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and unless restrained and enjoined will engage in further violations of these provisions.

3.      The Commission respectfully requests, as emergency and preliminary relief to preserve the *status quo*, an order temporarily freezing Defendants' assets and prohibiting Defendants from destroying or altering documents.  The Commission further requests an emergency order permitting the Commission to conduct expedited discovery and requiring Defendants to provide an accounting identifying the amount and location of all Fund assets. Finally, the Commission requests the Court issue an order to show cause why a preliminary injunction should not issue halting Defendants' fraudulent conduct pending a trial on the merits.

4.      At the conclusion of the litigation, the Commission respectfully requests, among other things, that the Court permanently enjoin Defendants from committing further violations of the federal securities laws as alleged in this Complaint, and order Defendants to pay disgorgement, plus prejudgment interest, civil penalties, and other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)-(e) & 78aa(a), and Sections 20(b)-(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b)-(d) & 77v(a).

6.      Venue is proper in the Western District of Pennsylvania pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Among other things, most of the Defendants, including the Hvizdzaks, reside in this District, and the Defendants conducted much of the activity alleged in this Complaint from their entities located in this District.

7.      Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails, including the use of email, telephone, and the internet in connection with illegal acts alleged in this Complaint, certain of which occurred within this District.  In addition, Defendants have solicited investors in several states, including Pennsylvania, California, and Florida, to purchase limited partner interests in the Fund.

## DEFENDANTS

8.      **Hvizdzak Capital Management LLC** ("HCM"), is a Pennsylvania limited liability company with its principal place of business in Bradford, Pennsylvania.  Shane and Sean Hvizdzak are HCM's sole members, and jointly had signatory authority over HCM's bank account.  HCM is not registered with the Commission in any capacity.

9.      **High Street Capital LLC** ("HSC") is a Pennsylvania limited liability company with its principal place of business in Bradford, Pennsylvania.  HSC is the investment management company for the Fund.  HSC is not registered with the Commission in any capacity.

3

10.     **High Street Capital Partners, LLC** ("HSCP") is a Pennsylvania limited liability company with its principal place of business in Bradford, Pennsylvania.  HSCP is the general partner of the Fund.  HSCP is not registered with the Commission in any capacity.

11.     **Shane Hvizdzak** ("Shane"), 32, resides in Bradford, Pennsylvania, and is the Co-Manager and Principal Trader for the HSC.

12.     **Sean Hvizdzak** ("Sean" and, collectively with "Shane," the "Hvizdzak Brothers"), 34, resides in St., Marys, Pennsylvania, and is the Co-Manager and Operations Director for the HSC.  Sean appears to be an attorney licensed in Pennsylvania.  Shane and Sean are brothers.

## OTHER RELEVANT ENTITIES

13.     **High Street Capital Fund USA, LP** ("the Fund") is a limited partnership established on March 26, 2019 with its principal place of business in Bradford, Pennsylvania. The Fund filed a notice of exempt offering of securities on Form D on May 30, 2019.

## FACTUAL ALLEGATIONS

### I.     The Fund And The Fund Defendants

14.     On March 26, 2019, the Hvizdzak Brothers formed the Fund to invest "in a wide variety of cryptocurrency investments."  As stated in the Fund's Private Placement Memorandum ("PPM"), the Fund operated as a "pooled investment vehicle through which the assets of its General Partner and the Limited Partners" were "invested in a wide variety of cryptocurrency investments."  The PPM further explained that the investment vehicle was an "algorithmic quant fund that intends to take advantage of the volatility of the cryptocurrency market," and its "primary investment objective is to achieve capital appreciation with above-average returns" for its limited partners using various predictive indicators.

15.     According to the Fund's operative documents, including the PPM and the limited partnership agreement ("LPA"), HSCP was the Fund's General Partner and was exclusively responsible for the Fund's management.

16.     Pursuant to an investment management agreement between the Fund and HSC, HSC agreed to serve as the Fund's Investment Manager, responsible for providing "advice and services . . . to manage the Investments and operate the Partnership."

17.     The Hvizdzak Brothers solely owned and controlled both HSC and HSCP and thus were alone responsible for the operations and management of the Fund and its investments. Hereinafter, the Commission refers collectively to Defendants HSCP, HSC, Shane, and Sean as the "Fund Defendants."

18.     As compensation for managing the Fund, HSC and HSCP were entitled to (1) "Management Fees" equal to approximately 1.5 percent annually of each limited partner's share of the Fund's net asset value, paid monthly, and (2) a "Performance Allocation" equal to 30 percent of each limited partners' net profit each quarter, subject to certain limitations.  HSC and HSCP were entitled to use Fund assets to pay certain operating expenses, including marketing expenses and third-party service fees, but the Fund did not pay HSC's day-to-day expenses.

19.     The Fund's LPA required that the Fund maintain proper custody of Fund assets. Pursuant to the LPA, Defendant HSC could open bank and other financial accounts in the Fund's name, and "to the extent that funds are not invested, to deposit and maintain such funds in the name of the [Fund] in such accounts," as well as invest in short-term investments, "provided, however, that the Partnership funds shall not be commingled with the Funds of any other Person."

20.     The Fund Defendants established two Fund bank accounts at Signature Bank, with account numbers ending in x1705 and x1713.  These were the Fund's only bank accounts, and Sean and Shane both had signatory authority over these accounts.

21.     The Fund's Signature Bank accounts were monitored by a third party administrator, Administrator A, which, among other things, was responsible for monitoring the Fund's control of assets in accordance with the LPA.

22.     The Fund Defendants represented that they intended to custody their digital assets through Gemini Trust Company LLC ("Gemini"), and that the "Fund may keep cryptocurrencies in different 'wallets' that are either controlled directly by the Fund or by various exchanges on behalf of the Fund."  The Fund Defendants further represented that the "Fund's cryptocurrencies and other digital assets will be segregated using unique digital asset addresses in the Custodian's cold storage system, which will be independently verifiable and auditable on their respective blockchain."

23.     Defendants established a Fund account ending x3034 at Gemini to conduct the Fund's digital asset trading.  Sean and Shane both controlled the Fund's Gemini account, along with HSC's Chief Financial Officer.

24.     By May 30, 2019, the Fund Defendants began offering and selling limited partnership interests to investors, claiming an exemption from registration pursuant to the Federal securities laws.

25.     In 2019, the Fund Defendants recorded with its administrator that the Fund raised approximately $540,000 selling limited partnership interests to five limited investors (not including Sean and Shane).

26.     Only one of these recorded investors paid in U.S. dollars (the remainder made in-kind payments in digital assets), and that investor sent his funds to a bank account in the Fund's name at Signature Bank on September 20, 2019.  Administrator A recorded these individuals as limited partners in the Fund.

27.     In 2019, the Fund sent a total of $645,000 to its account at Gemini, and by the end of 2019, the Fund held approximately $550,000 in digital assets and another approximately $1.7 million in various Fund accounts.

28.     In all, for 2019, the Fund recognized a net loss of approximately $477,000 from its digital asset investments, for a net loss of approximately 25 percent.

29.     In 2020, the Fund Defendants accepted new limited partners.  As of April 20, 2020, the Fund Defendants informed Administrator A that the Fund added five new limited partners, three of whom paid in U.S. dollars totaling $1.1 million (and the rest making in-kind payments using digital assets).

## II.     Defendant HCM And The HCM Account

30.     Defendant HCM is an entity owned and controlled by the Hvizdzak Brothers.

31.     The Hvizdzak brothers are the sole signatories on HCM's bank account (ending in x4297) located at CNB Bank, Inc. ("HCM Account.")

32.     The Fund's operative documents do not disclose any connection between the Fund and Defendant HCM.

33.     Since at least July 2019, Sean and Shane have also confirmed by email to CNB Bank that there is no relationship between HCM and the Fund.  In response to an inquiry from CNB Bank about certain wire transfer activity, Sean and Shane represented that Defendant HCM was engaged in several businesses unrelated to the Fund.  The Hvizdzak Brothers also

represented to CNB Bank that all money received into the HCM Account compromised payments for services and data that Sean and Shane provide to their customers, not funds for any third-party investment, including the Fund.  Finally, the Hvizdzak Brothers confirmed to CNB Bank that they maintain all Fund money in Fund accounts at Signature Bank.

III.     **The Defendants' Fraudulent Conduct**

34.     Defendants conducted certain Fund business in accordance with their representations to investors and CNB Bank:  certain Fund investors deposited their investments into Fund accounts at Signature Bank and Gemini, and the Fund pooled their investments and traded digital assets on the Fund's behalf.  Tax records show that trading resulted in a net loss to the Fund for 2019 for those investors.

35.     In and around November 2019, however, Defendants began acting outside of this established Fund structure, directing *other* investors in the Fund to send their investments to the HCM Account at CNB Bank.  Defendants then simply misappropriated those investors' money to their personal and other non-Fund accounts and did not invest that money as represented in the PPM and LPA.  In addition, the Fund Defendants made numerous material misstatements to potential investors concerning the Fund's assets and performance, including providing potential investors with fabricated audited financial statements for the Fund.

A.     **Defendants Misappropriated Fund Assets Through The HCM Account**

36.     Contrary to the Fund's operative documents and representations to investors and CNB Bank, by at least November 2019, Defendants instructed certain investors by telephone to send their investments to the HCM Account at CNB Bank.  From there, Defendants simply misappropriated these funds by transferring them to their personal and other non-Fund accounts.

37.     By doing so, the Fund Defendants violated the Fund's LPA custody provisions, which required that the Fund maintain all un-invested money in Fund bank accounts segregated from any other money.  It also had the effect of permitting Defendants to make use of such funds outside of Administrator A's supervision and monitoring.  The misappropriations also contravened the representations in the PPM as to how investor proceeds would be used.

38.     In all, since Defendants began receiving money for the Fund in July 2019, the HCM Account has received $31 million from third parties.  Since July 1, 2019, Defendants transferred almost $26 million from the HCM Account to their personal accounts, or over 80 percent of the funds in the HCM account during that period.

39.     In contrast, since September 25, 2019, Defendants transferred approximately $930,000 to a Fund account, and only approximately $65,000 since September 25, 2019.

40.     Based on bank records, Defendants have misappropriated at least $3 million from two investors, Investors A and B, and additional bank activity suggests that they have misappropriated millions more from many additional investors.

41.     For example, Shane solicited Investor A to invest in the Fund in or around November 2019.  Prior to Investor A's investment in November 2019, the Fund Defendants provided Investor A with the LPA, PPM, and materials reflecting positive returns.  Investor A understood that he invested a total of $2 million into the Fund between November 2019 and January 2020.

42.     However, the Fund's administrator did not include him as a limited partner in the Fund for 2019.  At Shane's direction, Investor A sent his Fund investment by wire to the HCM Account, not a Fund account.  Each time Investor A sent money to be invested in the Fund,

Defendants quickly misappropriated most, if not all, of it by moving it to their personal accounts at CNB Bank.

43.     For example, on November 8, 2019, Investor A wired $400,000 from an investment account to the HCM Account, which only held approximately $41,000 in other funds at the time.  That same day, Defendants wired $200,000 to Shane's personal account and wrote a $200,000 check that was deposited in Sean's personal account.  Defendants did not send any of Investor A's money to a Fund account.

44.     On November 12, 2019, Investor A sent $600,000 to the HCM Account, which only held approximately $62,000 in other funds at the time.  That same day, Defendants wired $300,000 to Shane's personal account and $300,000 to Sean's personal account.  Defendants did not send any of Investor A's money to a Fund account.

45.     Subsequent to Investor A's November 2019 investments, the Fund Defendants provided Investor A with materials claiming that he had positive returns on his investments.

46.     On January 14, 2020, Investor A sent another $1 million to the HCM Account, which only held approximately $2,600 in other funds at the time.  That same day, Defendants wired approximately $357,000 to Shane's personal account and approximately $357,000 to Sean's personal account.  Defendants did not send any of Investor A's money to a Fund account.

47.     Similarly, Shane solicited Investor B to invest in the Fund in or about April 2020. Shane provided Investor B with the LPA, the PPM, and materials indicating positive net returns for the Fund.  Bank records indicate that, as with Investor A, Defendants similarly misappropriated Investor B's $1 million investment.  On April 3, 2020, Shane instructed Investor B to send funds to Defendant HCM.  Investor B then wrote two checks totaling $1 million to

Defendant HCM.  Defendants deposited Investor B's $1 million in checks into the HCM

Account, which only held approximately $86,000 before the deposit.

48.     After receiving another approximately $1 million from other sources, on April 20,

2020, Defendants transferred almost $2.5 million to an energy company not identified in the

Fund documents and not involved in the trading of digital assets.  This transfer left only

approximately $124,000 in the HCM Account.

49.     Defendants did not send any of Investor B's money to a Fund account, and as of

April 20, 2020, Administrator A did not list Investor B as a limited partner.

50.     Beyond Investors A and B, bank records indicate that the Fund Defendants may

have fraudulently raised and misappropriated millions of dollars from other Fund investors.

Most wire transfers into the HCM Account do not indicate their purpose.  But from July 1, 2019,

until May 22, 2020, the HCM Account received approximately $18.75 million from 17 different

third parties where the wire instructions that accompany the transfers specifically indicate that

the deposit was for an "investment," related to the Fund, and/or otherwise originated from an

investment-related bank account such as a ROTH Individual Retirement Account ("IRA") or

other brokerage account.

51.     Of these transfers, five of the individuals who transferred approximately $480,000

to the HCM Account sent at least one wire that expressly indicated it related to the Fund.  The

transfers are as follows:

      a.     On February 4, 2020, the HCM Account received a $70,000 wire from an

            individual who noted on the wire transfer, "for further credit to [individual's

            name], LP investor."  "LP" is a common abbreviation for "limited partner."

      b.      On February 5, 2020, another individual sent $25,000 to the HCM Account with the following note, "Further Credit to High Street Capital Liquid Fund Attention Shane Hvizdzak," which appears to mean the Fund.

      c.      Two wires on April 24, 2020, and May 15, 2020, totaling $200,000 from an investment firm that note "Investment HSC"; and

      d.      Wires from two individuals that name the Fund as the wires' beneficiary.

52.      Consistent with Defendants' misappropriation of Investor A's and B's funds, Defendants typically sent most, if not all, of these funds to their personal accounts.  For example, on May 18, 2020, a married couple sent $10 million from their brokerage account to the HCM Account, which at the time contained only approximately $37,500.  That same day, Defendants wired $8 million to Shane's personal account, and all but approximately $625,000 of the remaining funds to individuals and entities that are not digital custodians or trading platforms.  None of the $10 million received on May 18 went to the Fund.

53.      Similarly, before receiving two transfers totaling $220,000 on May 13 and 15, 2020, the HCM Account had a balance of only $37,544.  On May 15, 2020, HCM wired exactly $220,000 to Shane's personal account.

**B.      The Fund Defendants Fraudulently Solicited And Sold Investments In The Fund**

54.      The Fund Defendants also fraudulently offered and sold limited partnerships in the Fund since at least November 2019 by making material representations to investors regarding the Fund's management fees and performance, as well as providing prospective investors with a forged audit of the Fund's purported financial statements .

55.      Pursuant to the PPM and LPA, dated November 15, 2019, and June, 1, 2019, respectively, HSC and HSCP were entitled to compensation for managing the Fund consisting

of:  (1) "Management Fees" equal to approximately 1.5 percent annually of each limited

partner's share of the Fund's net asset value, paid monthly, and (2) a "Performance Allocation"

equal to 30 percent of each limited partners' net profit each quarter, subject to certain limitations.

56.     The Fund Defendants continued to make these representations in the PPM and

LPA from November 2019 to the present despite the fact that the Fund Defendants, by

misappropriating Fund investments, repeatedly took amounts far in excess of the 1.5%

management fee.

57.     Additionally, in the third quarter of 2019, the Fund lost 17.12 percent and loses

continued into the fourth quarter, for a total loss of 24.5 percent in 2019.  Because the Fund lost

money in 2019, the Fund Defendants were never entitled to a "performance allocation."  Again,

the PPM and the LPA contained these representations after November 2019 even though the

Fund Defendants continued to take, via misappropriations of investor funds, amounts far in

excess of the representations.

58.     In December 2019, Shane solicited Investor C to invest in the Fund.  On

December 30, 2019, Shane sent Investor C several Fund documents, among them was a Fund

summary that, among other things, represented that the Fund had achieved substantial profits

each quarter.  Specifically, Shane represented to Investor C that the Fund had 134.87 percent and

100.77 percent returns trading in digital assets in the second and third quarters of 2019.  These

representations were false.  By the end of the third quarter of 2019, the Fund had *lost* 17.12

percent of its value.  The Fund Defendants appear to have sent similarly false performance

results to Investor A in or around November 2019.

59.     The Fund Defendants also made numerous material misstatements when soliciting

an investor in March and April 2020.  At that time, the Fund Defendants were in discussions

with an investment adviser ("Investment Adviser A") who had three clients interested in investing in the Fund.

60.     On or around March 13, 2020, Shane sent Investment Adviser A an investor "pitch" presentation, which, among other things, claimed that, for the third and fourth quarters of 2019, the Fund had 100.77 percent and 92.90 percent gains, respectively.

61.     These representations were false.  During these periods, the Fund had ***lost*** money: 17.2 percent in the third quarter and further losses each month in the fourth quarter, for a total loss of 24.2 percent in 2019.

62.     Without knowing the fraudulent nature of the Fund's financial performance, Investment Advisor A reviewed these performance figures and other Fund documents with his clients.  Investment Adviser A's clients decided to invest a total of $2 million pending review of the Fund's 2019 audited financial statements.  On April 17, 2020, Shane sent Investment Adviser A the Fund's purported audited financial statements for review, including the financial statements and an audit opinion from the auditor.

63.     Investment Advisor A immediately suspected the financial statements and audit opinion were fabricated because they contained numerous irregularities to the standard format for audit opinions.  Investment Adviser A contacted the Fund's purported auditors, who confirmed that they did not, in fact, perform any audit services or prepare any audit reports for the Fund.  The purported auditor explained to Investment Advisor A that the firm provided only tax services to the Fund.

64.     In addition to the fact Defendants' fabricated the audit documents, the financial statements contained misstatements about the Fund's performance.  The financial statements claimed that the Fund had over $157 million in assets as of December 31, 2019, including $107

million in Gemini accounts.  In fact, however, the Fund had only $2.2 million in cash and cash equivalents, including only $0.53 at Gemini, as of December 31, 2019.  They contained additional false claims, including a representation that the Fund earned net income of $132 million in 2019 when it had actually lost money.

65.     Investment Adviser A's clients ultimately decided not to invest after receiving the fabricated audited financial statements.

## IV.     Defendants Have Repeatedly and Recently Dissipated Investor Assets

66.     In addition to Defendants fraudulent conduct described in this Complaint, Defendants have repeatedly and recently dissipated investor assets.  In April and May 2020 alone, the HCM Account at CNB Bank received approximately $20 million from various third parties including Investor B's $1 million and over $15 million that was sent from either brokerage accounts of individuals or otherwise indicated that the payment was for an "investment."  From there, in April and May 2020, Defendants sent over $14.6 million of these funds to Shane's or Sean's personal accounts at CNB Bank, where they were likely commingled with other funds.

67.     Since July 2019, Shane and Sean have transferred nearly $18 million from their personal bank accounts to their personal accounts with Gemini, a digital asset custodian and trading platform.  In April and May 2020 alone, Shane transferred $14.7 million from his personal account at CNB Bank to a personal account with Gemini, including as recently as May 22, 2020.

68.     Defendants hold numerous accounts at digital asset custodians and trading platforms including Gemini, Binance Holdings, Limited ("Binance"), and Bittrex, Inc. ("Bittrex").  Digital asset custodians and trading platforms provide customers with accounts in

which they can hold and trade digital assets, such as Bitcoin, and exchange digital assets with fiat currency.  Once this fiat currency, in this case U.S. dollars, is exchanged for a digital asset, Defendants can transfer the digital assets anywhere in the world with no bank and no government forms.

69.    Defendants have, in fact, recently transferred millions of U.S. dollars of investor money from the HCM Account at CNB Bank to their personal bank accounts and then to their personal accounts at Gemini.  From their personal accounts at Gemini, Defendants then transferred the equivalent of millions of U.S. dollars to various custodians and trading platforms including platforms outside the United States and to unattributed addresses on multiple blockchains, such that, in some cases, the location of the holder(s) of such assets cannot be determined.

70.    Between July 1, 2019, and June 14, 2020, Shane transferred more than $20 million from his Gemini personal account to various locations on various blockchains, including more than $5 million between April 1 and June 14, 2020 to unattributed, non-custodial locations on various blockchains.

71.    Defendants' dissipation of assets continues to this day.  Since June 1, 2020, Shane has transferred approximately $2.4 million form his personal Gemini account to various blockchain locations.

72.    As Defendants dissipated investor assets and continued to solicit new investors, on June 3, 2020, Shane appeared to have notified some investors, by email, that the Fund "had a great run over the past year," but that he would close the Fund and liquidate Fund assets starting on June 30, 2020.  As of June 15, 2020, neither Investors A nor B received this notice.

## FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
(Against Defendants)

73.    Paragraphs 1 through 72 are re-alleged and incorporated by reference herein.

74.    Since at least March 2019, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

75.    By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

## SECOND CLAIM FOR RELIEF

**Violations of Securities Act Section 17(a)**
(Against Defendants)

76.    Paragraphs 1 through 72 are re-alleged and incorporated by reference herein.

77.    Since at least March 2019, Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or

17

omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

78.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a) of the Securities Act,15 U.S.C. §§ 77q(a).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

An Order Temporarily and preliminarily restraining and enjoining Defendants from violations of Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.]

### II.

Issue an Order temporarily and preliminarily freezing all of Defendants' assets;

### III.

Issue an Order temporarily and preliminarily enjoining and restraining Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents;

### IV.

Issue an Order providing that the Commission may take expedited discovery;

**V.**

Issue an Order requiring Defendants to repatriate all assets obtained from the activities described in the Commission's Complaint that are now located outside the territorial limits of the United States.

**VI.**

Issue an Order requiring Defendants to provide a sworn account of all funds received by Defendants, all assets and funds owned and controlled, and identifying all accounts over which they have rights or control.

**VII.**

Issue a Final Judgment permanently restraining and enjoining (A) Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from (i) violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; (ii) violating Section 10(b) of the Exchange Act, [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**VIII.**

Issue a Final Judgment directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

**IX.**

Issue a Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**X.**

Grant such further relief as the Court may deem just and appropriate.

**<u>DEMAND FOR A JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated: June 16, 2020                    Respectfully submitted,


                                        <u>/s Matthew Scarlato</u>
                                        Matthew Scarlato (*Pro hac vice* motion to be filed)
                                        James Smith (*Pro hac vice* motion to be filed)
                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE
                                         COMMISSION
                                        100 F Street, NE
                                        Washington, DC  20549
                                        Tel:  (202) 551-3749 (Scarlato)
                                        Tel: (202) 551-5881 (Smith)
                                        scarlatom@sec.gov
                                        smithja@sec.gov


Of Counsel:

Corey Schuster
Jan M. Folena
Morgan B. Ward Doran
Luke Fitzgerald
Donna Norman
Andrew Shoenthal
SECURITIES AND EXCHANGE
 COMMISSION